*Kor-Ko Ltd. and John E. Rothamel v. Maryland Department of the Environment*, No. 23, September Term, 2016.  Opinion by Harrell, J.

**MARYLAND DEPARTMENT OF THE ENVIRONMENT—REGULATORY INTERPRETATION—COMAR 26.11.15.06—WHERE TO MEASURE AMBIENT IMPACTS FOR CREMATORIUM CONSTRUCTION PERMIT**

The Maryland Department of the Environment (MDE) interpreted permissibly the term "premises" in § 26.11.15.06 of its ambient air regulations as the property line of the commercial park in which the applicant's crematorium business building was located. This interpretation accords with a dictionary definition of the term, other instances of the term's appearances elsewhere within the same regulatory regimen, and the MDE's methods of screening airborne toxins in order to prevent them from risking unreasonable danger to human health.

Circuit Court for Anne Arundel County
Case No. 02-C-13-180980

Argued: November 4, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 23

SEPTEMBER TERM, 2016

---

KOR-KO LTD. AND JOHN E. ROTHAMEL

v.

MARYLAND DEPARTMENT OF THE
ENVIRONMENT

---

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty
Harrell, Glenn T., Jr.,
    (Senior Judge,
                Specially Assigned),
                            JJ.

---

Opinion by Harrell, J.
Greene, McDonald, and Watts, JJ., dissent.

---

Filed: January 25, 2017

> Dust in the wind;
> All we are is dust in the wind.
>
> > Opening lyrics of "Dust in the Wind" on
> > Kansas's "Point of Know Return" album (1977).

Would Kansas's song have made it to No. 6 on the "Billboard Hot 100" and achieved Gold Record sales status in 1978 had listeners understood that the dust in the wind may have contained arsenic, hexavalent chromium, hydrogen chloride, dioxins, and mercury, as we learn from the controversy before us, a case involving the emissions to the air from the operation of a crematorium? Kor-Ko, Ltd. (Kor-Ko), the principal Petitioner in the present case,[1] seeks to overturn the Maryland Department of the Environment's (MDE) grant of a construction permit to Maryland Crematory, LLC (MC), to operate a crematorium in the same commercial/industrial park building in Millersville, Maryland, containing Kor-Ko's business operations.

## FACTUAL AND PROCEDURAL BACKGROUND

MC submitted in 2011 a permit application to the MDE for the construction of a human remains crematory incinerator at 408 Headquarters Drive, Suite 10, Millersville, Maryland 21108. The air emissions from the incineration of human remains may produce a panoply of toxic pollutants, including, among other contaminants, arsenic, chromium, dioxins, and mercury. On 27 October 2011, the MDE notified MC that its original application submission failed to quantify the crematory's future toxic output or

---

[1] John Rothamel, Kor-Ko's vice-president, is also a Petitioner. We refer collectively to Petitioners as "Kor-Ko" in this opinion.

show that the emissions "will not unreasonably endanger public health," pursuant to Code of Maryland Regulations (COMAR) 26.11.15.04 and 26.11.15.06. The MDE allowed MC 90 days to supplement its application.

MC submitted a Toxic Air Pollutant Analysis on 7 December 2011, but the MDE found the supplemented application deficient, as memorialized in a letter to MC dated 27 December 2011. MC re-supplemented its application in January and February of 2012 with additional information, but, again, the MDE notified MC that its application remained lacking. On 21 March 2012, however, the MDE pivoted somewhat. In a letter to MC, the MDE concluded that MC "provided an overall sufficient toxics analysis within the 90 day requirement.[2] The 90 day clock is stopped[,]" but that some details of the application "still need[ed] to be addressed[.]" In a follow-up document, the MDE explained that, despite MC's application remaining "inadequate with regards to dioxin and furan emissions," the MDE "was ultimately able to resolve this . . . inadequacy of the compliance demonstration" by performing its own calculations as to the quantitative and qualitative models for these toxins.

The MDE reached and published a Tentative Determination, on 9 August 2012, to issue the permit because the agency expected the crematory would meet the relevant air quality requirements. Following an advertised legislative-style public hearing held by the

---

[2] Kor-Ko does not challenge the MDE's determination as to compliance with the 90 day application requirement established by the MDE in its 27 October 2011 correspondence to MC.

2

MDE on 6 September 2012, opponents of the proposed issuance of the permit (including Petitioners) submitted, on 13 November 2012, supplemental written comments.[3]

Combining hypothetical toxin dispersion and concentration data with information from an EPA database about the specific contaminants emitted by human remains incinerators, the MDE compared (in a modeling exercise) the maximum concentrations of MC's anticipated pollutants with screening levels determined safe for human exposure. The MDE's screening process found that the predicted pollutant concentrations, modeled at ground level at the boundary of the commercial park in which MC proposed to locate its business, would not endanger unreasonably human health. URS Corp., a consultant hired by opponents of the proposed permit action, calculated independently that the anticipated pollutants' dispersal and concentration levels, measured at the rooftop air handlers height of MC's building (in which Kor-Ko was an existing tenant) within the commercial park, several pollutants, particularly arsenic and mercury, would reach concentrations that exceed the MDE's threshold levels for safety for human health.

Effective 24 July 2013, the MDE issued the construction permit, together with its Final Determination and responses to some of the previously received public comments,

---

[3] Pursuant to Md. Code, Environment Art. (EN), § 1-604(b)(1)(i) and (ii) (2013 Repl. Vol.), written comments adverse to the MDE's tentative decision must be submitted within 30 days of publication of the notice of the Tentative Determination, or within five days of the public hearing (in order to trigger the MDE's duty to issue a Final Determination). Here, permit opponents invoked their right under § 1-606(d)(ii) to "[e]xtend the public comment period by 60 days." As a consequence, the MDE established 13 November 2012 as the final day of the comment period.

including the URS report.[4]  On 16 August 2013, Kor-Ko and other parties to the agency proceedings sought judicial review in the Circuit Court for Anne Arundel County of the MDE's Final Determination to issue the permit.  In an order entered on 26 September 2014, the court remanded the matter to the MDE to analyze specifically MC's potential emissions' toxicity to people in adjacent buildings in the office park that use rooftop air handlers.  On the MDE's direct appeal, the Court of Special Appeals reversed, in an unreported opinion, remanding the case to the circuit court with instructions to affirm the MDE's issuance of the permit.  Kor-Ko filed electronically, on 21 April 2016, its petition for writ of certiorari.[5]  On 23 June 2016, we granted Kor-Ko's petition to consider potentially the following questions, as formulated by Kor-Ko:

> The overriding question presented in this action for judicial review is whether MDE erred by issuing a permit to a facility that will unreasonably endanger human health.  *See* COMAR § 26.11.15.06.  That question has three subparts that are presented for review:
>   1. Did MDE err by interpreting the definition of "premises" to mean the entire commercial park?

---

[4] In its responses, the MDE addressed the URS report, stating that the modeling of toxins within the commercial park was unnecessary:

> Maryland Cremation is a tenant in the Headquarter Commercial Center . . . .  The commercial park itself meets the definition of premises; therefore the emissions coming from the premises, i.e. the commercial park, are the emissions that must not unreasonably endanger public health.  The Department's air toxics regulations do not apply within the premises itself.

The MDE disputed also several aspects of the methodology employed by URS that led to the consultant's conclusions that some of the toxins anticipated to be released by MC could reach unsafe levels.

[5] Kor-Ko filed inadvertently its petition in the circuit court.  We granted its Motion to Extend Time to file timely its petition in this Court.

4

2. Did MDE err by concluding that its "air toxics regulations do not apply" anywhere within the entire commercial park?

3. Did MDE, having reached an erroneous conclusion on those two questions, err by not evaluating whether emissions of toxic air pollutants will unreasonably endanger the health of the neighboring tenants, including Petitioners?

**STANDARD OF REVIEW**

"When this or any appellate court reviews the final decision of an administrative agency . . . , the court looks through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluates the decision of the agency." *People's Counsel for Baltimore Cnty. v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007) (citing *Mastandrea v. North,* 361 Md. 107, 133, 760 A.2d 677, 691 (2000)). Our analysis, therefore, focuses squarely on the MDE's decision to issue the contested construction permit. Our review is limited generally to the administrative record. Md. Code, Environment Art. (EN), § 1-601(d) (2013 Repl. Vol.).

The applicable level of judicial scrutiny depends often on the nature of the agency's process and/or action, e.g., quasi-judicial or quasi-legislative. On one hand, this Court described agency processes or actions as quasi-judicial when:

> "(1) the act or decision is reached on individual, as opposed to general, grounds, and scrutinizes a single property . . . and (2) there is a deliberative fact-finding process with testimony and the weighing of evidence." Normally, that requires a contested case hearing, so that evidence (as opposed to informal statements of general beliefs) may be presented, challenged, and analyzed, in order that reasonable credibility determinations can be made.

*Md. Bd. of Pub. Works v. K. Hovnanian's Four Seasons at Kent Island, LLC*, 425 Md. 482, 515, 42 A.3d 40, 59 (2012) (quoting *Md. Overpak Corp. v. Mayor and City Council*

5

*of Baltimore*, 395 Md. 16, 33, 909 A.2d 235, 245 (2006)). On the other hand, an agency process or action is seen as quasi-legislative when "'the [action] is one making a new law—an enactment of general application prescribing a new plan or policy[, as opposed to] one which merely looks to or facilitates the administration, execution, or implementation of a law already in force and effect.'" *Hovnanian's Four Seasons*, 425 Md. at 514, 42 A.3d at 59 (quoting *City of Bowie v. Cnty. Comm'rs for Prince George's Cnty.*, 258 Md. 454, 463, 267 A.2d 172, 177 (1970)).

The MDE's issuance of the construction permit to MC appears facially to fall in-between our recognized indicia distinguishing adjudicative from legislative agency processes or actions. By issuing the permit, the MDE affected directly the rights and responsibilities of the applicant, MC, not crematorium operators at-large. The State environmental statute, however, forbids contested hearings in this kind of permit application process,[6] although the MDE's procedures did involve, for example, fact-intensive consideration of scientific information—the computer modeling of the dispersion and concentration of toxins from the crematory, the assumptions and conclusions of which could be, and were, contested via the submission of opposing public comments.

---

[6] EN § 1-601(b) states: "For permits listed under subsection (a) of this section, a contested case hearing may not occur." Subsection (a)(1) lists, as one type of applicable permit, "[a]ir quality control permits to construct subject to § 2-404 of this article[.]" Section 2-404, Construction permits, subsection (a)(1), applies to the "[c]onstruction of a new source[.]" Finally, under § 2-101(i), "'[s]ource' means any person or property that contributes to air pollution."

6

In 2016, this Court applied the standards of appellate review for quasi-judicial decisions to a permit decision by the MDE in a scenario governed by the same permitting statute involved in the present case:[7] "[a]lthough this statute does not set forth a standard of review, the substantial evidence and arbitrary and capricious standards apply where an 'organic statute' authorizes judicial review without a contested case hearing and does not set forth a standard of review." *Md. Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 118, 134 A.3d 892, 910 (2016), *reconsideration denied* (May 20, 2016) (citing *Supervisor of Assessments of Carroll Cnty. v. Peter & John Radio Fellowship, Inc.*, 274

---

[7] EN § 1-601 specifies the following applicable categories of MDE permits to be free of contested case hearing processes:

(1) Air quality control permits to construct subject to § 2-404 of this article;
(2) Permits to install, materially alter, or materially extend landfill systems, incinerators for public use, or rubble landfills subject to § 9-209 of this article;
(3) Permits to discharge pollutants to waters of the State issued pursuant to § 9-323 of this article;
(4) Permits to install, materially alter, or materially extend a structure used for storage or distribution of any type of sewage sludge issued, renewed, or amended pursuant to § 9-234.1 or § 9-238 of this article;
(5) Permits to own, operate, establish, or maintain a controlled hazardous substance facility issued pursuant to § 7-232 of this article;
(6) Permits to own, operate, or maintain a hazardous material facility issued pursuant to § 7-103 of this article; and
(7) Permits to own, operate, establish, or maintain a low-level nuclear waste facility issued pursuant to § 7-233 of this article.

Md. 353, 355, 335 A.2d 93, 94 (1975) and *Med. Waste Assocs., Inc. v. Md. Waste Coal., Inc.*, 327 Md. 596, 621, 612 A.2d 241, 253 (1992)).[8]

We shall review, therefore, the MDE's Final Determination to issue the permit to MC as follows:

> Whether by statute or by common law, courts look for three things when reviewing a *quasi-judicial* decision: (1) were the findings of fact made by the agency supported by substantial evidence in the record made before the agency; (2) did the agency commit any substantial error of procedural or substantive law in the proceeding or in formulating its decision; and (3) did the agency act arbitrarily or capriciously in applying the law to the facts— in essence, whether a reasoning mind could reasonably reach the conclusion reached by the agency from the facts in the record. With respect to the findings of fact, judicial review is highly deferential. With respect to determining legal error, it is much less so.

*Hovnanian's Four Seasons*, 425 Md. at 514, 42 A.3d at 58 n.15 (citations omitted).[9]

This standard requires our review to be "narrow and highly deferential" with respect to administrative fact-finding. *Trinity Assembly of God of Baltimore City, Inc. v. People's Counsel for Baltimore Cnty.*, 407 Md. 53, 78, 962 A.2d 404, 418 (2008). "An

---

[8] We shall offer some further thoughts about the legislative mandate that these environmental permits proceed as other than through a traditional contested case administrative agency process with detailed findings of fact and conclusions of law, and how, in our view, that impacts the courts' abilities to afford meaningful review of such actions. *See infra* Part II.

[9] Kor-Ko contends that the *Hovnanian's Four Seasons* Court recited this quoted passage as the standard of review "[f]or judicial review actions where there was no contested case hearing." This is not accurate exactly. The Court used this passage to elucidate the standard of review for a prototypical quasi-judicial agency decision, not one that lacks a contested case hearing and formal findings of fact and conclusions of law in support of the decision. It was not until later in that opinion that the Court addressed the absence of a contested case hearing.

agency decision based on regulatory and statutory interpretation is a conclusion of law. Even when reviewing an agency's legal conclusions, an appellate court must respect the agency's expertise in its field. When an agency interprets its own regulations or the statute the agency was created to administer, we are especially mindful of that agency's expertise in its field." *Carven v. State Ret. & Pension Sys. of Md.*, 416 Md. 389, 406, 7 A.3d 38, 49 (2010) (citations and quotation marks omitted). Compared with a question of statutory interpretation, "[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Md. Transp. Auth. v. King*, 369 Md. 274, 288, 799 A.2d 1246, 1254 (2002) (citations and quotation marks omitted). We grant such deference to an agency's interpretation of its regulations because

> agency rules are designed to serve the specific needs of the agency, are promulgated by the agency, and are utilized on a day-to-day basis by the agency. A question concerning the interpretation of an agency's rule is as central to its operation as an interpretation of the agency's governing statute. Because an agency is best able to discern its intent in promulgating a regulation, the agency's expertise is more pertinent to the interpretation of an agency's rule than to the interpretation of its governing statute.

*King*, 369 Md. at 289, 799 A.2d at 1254 (citations and quotation marks omitted). Put another way, the courts do not play the role of an über administrative agency in reviewing the actions of state or local administrative bodies, but, rather we exercise discipline in our review so as not to cross the separation of powers boundary.

## DISCUSSION

Prior to building a human remains incinerator or other similarly-regulated source of air pollution, an applicant must obtain a construction permit from the MDE. COMAR

9

26.11.02.02B. Pursuant to COMAR 26.11.15 and 26.11.16, the MDE regulates Toxic Air Pollutants (TAPs) and provides related procedural requirements to prevent unreasonable danger to human health, among other objectives. COMAR 26.11.15.06, Ambient Impact Requirement, subsection A(1), reads as follows:

> A. Requirements for New Installations, Sources, or Premises.
>
> > (1) Except as provided in §A(2) of this regulation, a person may not construct, modify, or operate, or cause to be constructed, modified, or operated, any new installation or source without first demonstrating to the satisfaction of the Department using procedures established in this chapter that total allowable emissions from the premises of each toxic air pollutant discharged by the new installation or source will not unreasonably endanger human health.

Permit applicants may satisfy this requirement by exemption, COMAR 26.11.15.03B(4) (not applicable in the present case), or by demonstrating compliance via "a screening analysis or second tier analysis," COMAR 26.11.15.07B(1), explained in COMAR 26.11.16.02 as a process of predicting the toxic and carcinogenic effects of the TAPs to be emitted by the source the applicant seeks to construct and operate.

> In its Brief, the MDE describes its screening and modeling process as follows:
>
> Under this approach, the Department sets the screening levels conservatively to ensure that the emissions will not unreasonably [en]danger human health. More specifically, to establish the screening level for a particular pollutant, the Department usually takes a value that measures "the airborne concentrations of a substance . . . represent[ing] conditions to which nearly all workers may be exposed without adverse health effects," COMAR § 26.11.15.01B(18), and then further divides that already safe value by 100. COMAR § 26.11.16.03A(1). The applicant then uses an air-dispersion computer model approved by the Department to determine whether the ground level concentrations of the predicted emissions for each pollutant will be below the relevant screening level at different distances away from the crematory. COMAR § 26.11.16.02C(1)(a). The most conservative air-dispersion model, which

10

was the model used in this case, is called SCREEN3. . . . If the projected emissions from the crematory do not exceed the screening levels, the permit applicant has complied with the ambient impact requirement.[10]

Kor-Ko argues that, by relying on toxin concentrations modeled at the boundary of the commercial park at ground level, but not within the commercial park (of which MC's and Kor-Ko's shared building is a part) at the level of rooftop air handlers, the MDE misinterpreted and misapplied unlawfully its own regulations' terms "premises" and "ambient air," rendering thereby its permit issuance unsupported by substantial evidence, legally erroneous in substance and procedure, and arbitrary and capricious. The MDE answers that it interpreted and applied properly the terms "premises" and "ambient air," and that, in the event we were to agree with Kor-Ko, we should remand the proceedings to the MDE, rather than invalidate the permit.

---

[10] As partial support for its assertion that "[t]he most conservative air-dispersion model, which was the model used in this case, is called SCREEN3," the MDE cites Md. Dep't of the Env't, Air & Radiation Mgmt. Admin., *Fact Sheet, Maryland's Toxic Air Pollutant (TAP) Regulations*. In its Reply Brief, Kor-Ko observes that, during the circuit court proceedings, the permit opponents, including Kor-Ko, offered this document into evidence as an appendix to their Rule 7-207 Memorandum. The circuit court granted the MDE's motion to strike the document from the record. Kor-Ko maintains that MDE did not challenge that decision on appeal in the Court of Special Appeals, so its current use of the stricken document is impermissible. Indeed, the circuit court granted the MDE's motion to strike this document on 20 March 2014, and accordingly, we will not consider it as a part of the record before us.

In additional support of its assertion regarding SCREEN3, the MDE cites also a document in the record entitled "Overview of the Toxic Pollutant Analysis Report" (not to be confused with the MDE "fact sheets" discussed *supra* and *infra*), which describes the SCREEN3 process as applied to MC's permit application. This document appears to be written from the MDE's perspective, but it bears no heading, signature, watermark, or other marker of identification.

In any event, whether SCREEN3 is the *most* conservative model is immaterial. We describe the regulatory formulae involved *infra* at page 17.

11

**I.  The MDE Interpreted "Premises" Permissibly As a Matter of Law and Applied It Without Apparent Arbitrariness or Capriciousness.**

Kor-Ko argues that the "premises" in question comprises the building in which the crematory is to be located, not the area at and inside the boundary of the entire commercial park of which the building is a part, and that, accordingly, modeling the output of toxins in the air emissions from the crematory vent at the boundary of the entire office/industrial complex was insufficient to protect the health of the tenants and employees within the buildings of the commercial park.  The MDE answers that the regulatory definition and agency interpretation of "premises" renders the boundary of the commercial park the proper locus for modeling, and that its screening levels applied at that point are conservative enough, if met, to protect people inside the complex as well from unreasonable danger to their health.

COMAR 26.11.15.06A(1), Ambient Impact Requirement, Requirements for New Installations, Sources, or Premises, states that

> a person may not construct, modify, or operate, or cause to be constructed, modified, or operated, any new installation or source without first demonstrating to the satisfaction of the Department using procedures established in this chapter that total allowable **emissions from the premises** of each toxic air pollutant discharged by the new installation or source will not unreasonably endanger human health.

(emphasis added).  As discussed *supra*, an applicant's regulatory compliance may be demonstrated by modeling the dispersion and concentration of toxins: "[e]missions shall be quantified in sufficient detail to determine whether **the premises** complies with the requirements of the chapter."  COMAR 26.11.15.04A(2) (emphasis added).  "'Premises' means all the installations or other sources that are located on contiguous or adjacent

12

properties and that are under the control of one person or under common control of a group of persons." COMAR 26.11.15.01B(12), COMAR 26.11.01.01B(36).[11]

MDE review of a permit application, therefore, requires the modeling of toxin concentrations at the boundary of the applicant's "premises." Thus, our review of the MDE's permit issuance implicates the task of regulatory interpretation. "'[T]he interpretation of an agency rule is governed by the same principles that govern the interpretation of a statute.'" *Carven*, 416 Md. at 407, 7 A.3d at 49 (quoting *Miller v. Comptroller of Md.*, 398 Md. 272, 282, 920 A.2d 467, 473 (2007)).

> When interpreting statutes, we seek to ascertain and implement the will of the Legislature. Our first step toward that goal is to examine the text. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. If ambiguities are found, other indicia of legislative intent are consulted, including the relevant statute's legislative history, the context of the statute within the broader legislative scheme, and the relative rationality of competing constructions.

*Harrison-Solomon v. State*, 442 Md. 254, 265–66, 112 A.3d 408, 415 (2015) (citations, quotation marks, and footnotes omitted). "To accomplish this task[,] the words of the statute are to be given their ordinary and natural import," *Scheve v. Shudder, Inc.*, 328 Md. 363, 372, 614 A.2d 582, 586-87 (1992) (citation and quotation marks omitted),

---

[11] The regulations define "installation" as "any article, machine, equipment, or other contrivance, including, but not limited to . . . incinerators, or any equipment or construction, capable of generating, causing, or reducing emissions." COMAR 26.11.01.01B(19), 26.11.15.01B(9). Defined by statute, "'[s]ource' means any person or property that contributes to air pollution." EN § 2-101(i).

including such aid as may be gleaned in that regard from dictionary definitions. *Montgomery Cnty. v. Deibler*, 423 Md. 54, 67, 31 A.3d 191, 198 (2011) (explaining that dictionary definitions are not "dispositive resolutions" of interpretive queries, but that "it is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning.") (citations and quotation marks omitted).

Because the same principles that govern statutory interpretation guide also regulatory interpretation, *Carven*, 416 Md. at 407, 7 A.3d at 49 (quoting *Miller*, 398 Md. at 282, 920 A.2d at 473), we apply transitively these principles to the interpretation of an agency rule:

> We . . . do not read [regulatory] language in a vacuum, nor do we confine strictly our interpretation of a [regulation's] plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the [regulatory] scheme to which it belongs, considering the purpose, aim, or policy of the [agency] in enacting the [regulation]. We presume that the [agency] intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a [regulation], to the extent possible consistent with the [regulation's] object and scope.

*Lockshin v. Semsker*, 412 Md. 257, 275–76, 987 A.2d 18, 29 (2010) (citations omitted).

The MDE offers several arguments in support of its interpretation of "premises" as extending to the property line of the commercial park.[12] First, the MDE looks to a

---

[12] The MDE maintains, and Kor-Ko does not dispute, that the entire commercial park is owned by a single landlord/business entity, Stone Snyder, meeting thereby the "control of one person or under common control of a group of persons" prong of the regulatory definition of "premises." The record includes scattered bits of evidence about ownership of the commercial park, such as an apparent property tax document indicating that Stone Snyder may own a property of over nine acres; communications about the

(Continued…)

dictionary definition of "premises." Merriam-Webster defines "premises" as "a tract of land with the buildings thereon," and "a building or part of a building usually with its appurtenances (as grounds)." MERRIAM-WEBSTER, *Premise*, https://www.merriam-webster.com/dictionary/premises [https://perma.cc/R8XY-QPBQ]. The MDE argues that such a definition coincides with "the Department's interpretation that 'premises' extends to the real property boundary of property owned by a single owner[.]" Whether Stone Snyder controls indeed the entire commercial park, the meaning of "premises," as evidenced by this dictionary definition, could be interpreted reasonably to encompass the entire complex where the record reveals no internal lot lines depicting separate ownership within a common development.

Second, other regulations in the Air Quality regulatory subtitle bolster the MDE's interpretation by using synonymously "premises" and "property line." COMAR 26.11.15.03B(4) exempts prospective installations and sources from the ambient air regulations in COMAR 26.11.15.06 if their toxic emissions "from a premises" are below a certain threshold "beyond the property line." Additionally, COMAR 26.11.06.08 states

---

(…continued)
installation of a septic system revealing that Stone Snyder owns the parcel located at 408 Headquarters Drive, Suite 10, Millersville, Maryland (MC's specific location within the complex); maps suggesting that the commercial park has a single owner; and Kor-Ko's representation before the circuit court suggesting that a single landlord owns the complex. This "evidence," although decidedly indirect, taken together with the fact that Kor-Ko did not challenge the MDE's assertion that a single landlord owns the commercial park, suggests that a single landlord, which may be Stone Snyder, is indeed the sole owner. Even if this is the case, this argument is less weighty than others marshaled by the MDE.

15

that "[a]n installation or **premises** may not be operated or maintained in such a manner that a nuisance or air pollution is created[,]" and in a parallel regulation, COMAR 26.11.06.09, persons are prohibited from causing or permitting "the discharge into the atmosphere of gases, vapors, or odors beyond the **property line** in such a manner that a nuisance or air pollution is created." (emphasis added). The use in these regulations of the term "premises" lends a whiff of reasonableness to the MDE's interpretation.[13, 14]

---

[13] Offering a counter-argument, Kor-Ko posits that a proper interpretation of the regulatory definition of "premises" must reference also the definitions of "installation" and "source." Based on the definitions provided *supra* in note 11, Kor-Ko states that "'[p]remises' means the equipment or machinery that emits air pollution, not the property where the equipment or machinery is located." This interpretation limits the geographical span of the "premises" to the incinerator itself. The very definition of "source," however, defines the term, in part, as "property that contributes to air pollution," suggesting that Kor-Ko's proposed interpretation is overly narrow. EN § 2-101(i).

[14] Consistent with EN § 1-606(c)(4)'s requirement that the agency record in this kind of case must include "[a] statement or fact sheet explaining the basis for the determination by the Department or Board," the MDE issued an explanatory fact sheet with its Tentative Determination on 9 August 2012, but the document did not provide any substantial reasoning for the MDE's choice to model toxins at the boundary of the commercial park for the purpose of determining health effects. There are two potentially illuminating conclusory statements, however, in the fact sheet: under the heading "Applicable Regulations," the MDE referenced "COMAR 26.11.15.06[,] which prohibits the discharge of toxic air pollutants to the extent that the emissions will unreasonably endanger human health." Later, under the heading "Toxic Air Pollutant Compliance Demonstration and Analysis," the MDE stated, in reference to COMAR 26.11.15.06, "[t]he projected maximum off-site ground level concentrations, in any direction, for Toxic Air Pollutants are at or below all applicable screening levels."

The use of the term "off-site" suggests consistency with the MDE's current asserted interpretation of "premises," and the term appears a few times in the MDE's responses to public comments. The MDE's argument in its brief, that "off-site" means beyond the boundary of the commercial park, relies on two supplemental fact sheets (which the MDE contends are guidance documents) that the MDE submitted for the first

(Continued…)

16

Third, and of greatest potency here, the MDE argues that its interpretation of "premises" protects adequately the health of the tenants and employees in the MC/Kor-Ko building and other buildings in the commercial development. For non-cancerous toxins, the MDE's screening levels are set conservatively at 1/100th of their "threshold limit value" (TLV). COMAR 26.11.16.03A(1). The TLV of a given toxin is "the airborne concentration of a substance that, according to the American Conference of Governmental Industrial Hygienists (ACGIH), represents conditions to which nearly all workers may be exposed without adverse effect[.]" COMAR 26.11.15.01B(18). Additionally, similarly conservative formulae are provided to screen non-cancerous toxins that do not have a TLV. COMAR 26.11.16.03A(2). For carcinogenic effects, the MDE uses screening levels standardized to the following rubric: if a person were exposed to a toxin continuously for 70 years, it would increase the person's cancer risk by one in 100,000. COMAR 26.11.16.03B(1). The MDE believes that such conservative screening requirements prevent MC's future emissions from endangering unreasonably human health—not only the health of humans beyond the commercial park, but also that of people working within the commercial complex.

---

(…continued)
time on appeal (impermissibly, according to Kor-Ko), and these fact sheets are the basis of the MDE's argument that it applied a "longstanding understanding of the term 'premises' here." Even if we were to consider those two supplemental fact sheets in our review, there is scant support elsewhere for the conclusory contention that the MDE maintained a "longstanding" and consistent interpretation as that asserted here.

Because we are reviewing the MDE's interpretation of its own regulations, "we are especially mindful of that agency's expertise in its field." *Carven v. State Ret. & Pension Sys. of Md.*, 416 Md. 389, 406, 7 A.3d 38, 49 (2010). Accordingly, we defer to the MDE's interpretation of "premises" and conclude that it is permissible legally, and neither arbitrary nor capricious, as applied via the MDE's decision to rely on the modeling and screening of toxin concentrations at the boundary of the commercial park on the ground, rather than requiring modeling at the rooftops of any building within the complex.[15]

---

[15] Even if the entire commercial park is owned by Stone Snyder, the MDE's invocation of landlord-tenant law principles as directive of an outcome in its favor is not very persuasive. In response to Kor-Ko's point that the commercial park is not under common control because the landlord leased parts of the complex to other businesses, the MDE states that, "as between the owner of real property and any one of the tenants, the owner of a leased property typically retains ultimate control over the common areas of the property." Kor-Ko retorts that control of common areas is irrelevant because that is not where MC operates its business. The MDE presses on, positing that the landlord retains control because, even when it transfers some level of control to a tenant via a lease, the landlord "has ultimate control because it is the landlord who determines how much of that control to give away." We conclude that these tit-for-tat arguments are not particularly helpful in deciding this case.

Also unhelpful is Kor-Ko's appropriation of the Court of Special Appeals's interpretation of "property line" espoused in the context of a criminal law case. *Fitzgerald v. State*, 153 Md. App. 601, 837 A.2d 989 (2003), *aff'd*, 384 Md. 484, 864 A.2d 1006 (2004). The *Fitzgerald* Court found the Fourth Amendment inapplicable beyond the "property line" of a rented apartment, meaning the physical boundary of the abode: "such places [as apartments] . . . do not typically throw out penumbral curtilages or surrounding Fourth Amendment buffer zones as do many, albeit not all, houses." *Fitzgerald*, 153 Md. App. at 666, 837 A.2d at 1026. Kor-Ko maintains that "[s]imilarly, Kor-Ko, including its rooftop air handler, is outside the property line of the leased premises where the crematory is operating. The health of Kor-Ko's employees is the 'human health' MDE is charged with protecting." Kor-Ko does not proffer, nor can we find, any principle of interpretation that requires the consistent interpretation of a term

---

(Continued…)

18

**II. We Need Not Address Directly the MDE's Interpretation of "Ambient Air," but We Shall Comment on the Question for the Collateral Purpose to Guide Future Agency Proceedings, Their Judicial Review, and the Legislature.**

Because, in holding that the MDE interpreted permissibly "premises," we defer to the MDE's expert opinion that its use of conservative screening values for toxins at the boundary of the commercial park protected adequately human health *inside the park*, we need not resolve the "ambient air" interpretation dispute,[16] which addresses the same "overriding question" presented by Kor-Ko: "whether MDE erred by issuing a permit to a facility that will unreasonably endanger human health."[17]

To guide perhaps future similar administrative proceedings, instances of their judicial review, and ideally the Legislature, however, we choose to comment on  the

---

(…continued)

across disparate legal domains.  As discussed above, moreover, we defer to the MDE's expert opinion that its calculations made at the boundary of the commercial park protect sufficiently the health of Kor-Ko's employees.

[16] Kor-Ko maintains that the MDE had a legal duty to model toxins within the commercial park, and specifically, at the height of building rooftops where presumably air intake handlers were situated, in order to fulfill its duty to protect human health.  The MDE responds that calculating toxin concentrations at the rooftop level is tantamount to modeling indoor air, an activity for which the MDE lacks arguably jurisdiction, and that, in any event, modeling toxins at ground level protects sufficiently human health.

[17] Thus, even if we rejected the MDE's "ambient air" argument that modeling air at the rooftops is equivalent legally to modeling indoor air, and agreed with Kor-Ko that "ambient air" exists indeed within the commercial park at the height of the building air handlers, the outcome here would not change because we would be bound to our fully-dispositive conclusion that the MDE allowed permissibly the boundary of the commercial park to serve as the location for modeling toxins for the purpose of determining health effects, based on our ratification of the MDE's interpretation of "premises."

portentous challenge inherent in the review of the sort of relatively nebulous agency procedure as we have here, which prohibits contested hearings and fails to require more formal and comprehensive explication of the reasoning of the agency for its Final Determination in these types of environmental permitting cases (beyond the "brief explanation" contained in the Tentative Determination, "fact sheet or sheets," and the selective instances of agency responses prompted by some of the public comments).[18]

The MDE argues that, because it now embraces the EPA's definition of "ambient air,"[19] it would be precluded from modeling toxins at the rooftop level of the air handlers because doing so would be tantamount to modeling indoor air, an action the MDE concludes is beyond its jurisdiction. The record includes the MDE's express rejection, however, in response to a public comment received regarding the Tentative

---

[18] As discussed in notes 6 and 7, *supra*, EN § 1-601(a) and (b) preclude contested case hearings for "[a]ir quality control permits to construct." For decisions on such permits, the MDE must publish a Tentative Determination, including "[a] brief explanation of the Department's tentative determination[,]" notify the public of its Tentative Determination and receive public comments thereon, allow for a publicly-requested public hearing, and prepare a Final Determination in certain circumstances, among other requirements. § 1-604. The agency's record must include also, per § 1-606(c)(4), "[a] statement or fact sheet explaining the basis for the determination by the Department or Board." The agency is not obliged to respond to all public comments, but rather may pick and choose where to do so. § 1-606(c)(9) (requiring the agency's record to include "[a]ny response to any comments submitted to the Department or Board.").

[19] "Ambient air means that portion of the atmosphere, external to buildings, to which the general public has access." 40 C.F.R. § 50.1(e). Drawing from this definition, the MDE argues that, because the record does not indicate that the general public has access to the rooftop of the Kor-Ko/MC building, the air surrounding the rooftop air handlers does not constitute "ambient air."

Determination, of the referenced EPA definition as not governing, controlling, or even applying to the MDE's ambient air regulations:

> The Maryland air toxics regulations under COMAR 26.11.15 and 26.11.16 have never been incorporated into the Maryland State Implementation Program (SIP), and are not subject to federal approval. Federal regulations do not govern or otherwise control these state-only regulations. As such, the federal definition of ambient air cited by the Permit Opponents does not apply to the Maryland air toxics regulations with regard to the Ambient Impact Requirement of COMAR 26.11.15.06.[20]

The MDE's apparent change of mind regarding its position on the application of the EPA's definition of "ambient air" would hamper our appellate review (if it were necessary to engage with the "ambient air" debate) because, typically, a court may affirm an agency decision only for the reasons the agency gave in reaching its decision:

> [j]udicial review of administrative action differs from appellate review of a trial court judgment. In the latter context the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court. However, in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and **for the reasons stated by the agency**.

*Walker v. Dep't of Hous. & Cmty. Dev.*, 422 Md. 80, 107, 29 A.3d 293, 309 (2011) (quoting *United Steelworkers of Am. AFL-CIO, Local 2610 v. Bethlehem Steel Corp.*, 298 Md. 665, 679, 472 A.2d 62, 69 (1984)) (emphasis added). The MDE's appellate assertion that the EPA definition of "ambient air" controls, or, at the very least, coincides

---

[20] Although perhaps this pronouncement could be read as not being inconsistent with the MDE's appellate embrace of the EPA's non-binding definition of "ambient air," we would have problems reaching that conclusion on this record.

with, its interpretation of its ambient air regulations was, most likely, not a reason on which the agency relied in issuing the permit, because the record indicates that, at the time of the MDE's Final Determination, the MDE appeared to hold at arm's length the EPA definition. Although the MDE's post-hoc position on the relevance of the EPA definition was of little concern to the Court of Special Appeals, the MDE's original reasoning is not perfectly clear, at least in part because the Legislature did not require it to express its reasoning in written, detailed findings of fact and conclusions of law, but rather fostered a somewhat looser and elusive decisional process. The problems experienced here by us in performing our duties are, in equal measures, inherent in the administrative process and how the MDE addressed it.

Suffice it to say for now, despite our venting here, we find succor in what we said about the uniqueness of this sort of agency "record" and decisional process in *Anacostia Riverkeeper*:

> Applying the substantial evidence standard of review to a case where no contested case hearing took place may seem anomalous because there is no formal record that was presented before an administrative law judge. EN § 1–606, however, expressly details the documents that can be included in a record. EN § 1–606(c)(1)–(9). For example, EN § 1–606 stipulates that any draft permit, comments submitted to MDE during the public comment period, transcripts of public hearings on the permit application, and responses to submitted comments constitute part of the administrative record. Thus, we are essentially reviewing the same record that we would have examined, excluding the administrative law judge's decision, had the merits of this case been subject to a contested case proceeding. Accordingly, our review of the issuance of the Permits fits within the substantial evidence standard of review contemplated by SG [State Government] § 10–222.

*Md. Dep't of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 119–20, 134 A.3d 892, 910–11 (2016), *reconsideration denied* (May 20, 2016).

## CONCLUSIONS

Kor-Ko's perception that the MDE failed to consider adequately the health of people within the commercial park is understandable. We must honor, however, the deferential standard of review that guides our assessment of the type of agency action before us. Accordingly, we hold that the MDE's interpretation of "premises," as extending to the property line of the commercial park, is free of legal error, and, the MDE's application of the term *vis-à-vis* allowing the modeling of toxins at that property line was not arbitrary or capricious. The MDE's issuance of the permit to construct MC's incinerator, therefore, was permissible.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

Circuit Court for Anne Arundel County
Case No. 02-C-13-180980

Argued: November 4, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 23

September Term, 2016

_____

KOR-KO LTD. AND JOHN E. ROTHAMEL

v.

MARYLAND DEPARTMENT OF THE
ENVIRONMENT

_____

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty
Harrell, Glenn T., Jr. (Senior
Judge, Specially Assigned),

JJ.

_____

Dissenting Opinion by Watts, J., which Greene
and McDonald, JJ., join

_____

Filed: January 25, 2017

Respectfully, I dissent. I disagree with the Majority's adoption of the Maryland Department of the Environment ("MDE")'s interpretation of "premises" as extending to the property line of the commercial park. Rather, I would hold that Kor-Ko, Ltd. ("Kor-Ko")'s interpretation of "premises" is correct, and that "premises" means the individual suite in which the crematory is to be located, not the area at and inside the boundary, or property line, of the commercial park in which the suite is located. Indeed, although the majority opinion is well written and contains no mistakes in any of the applicable standards or case law, the Majority does not review the plain language of the relevant Code of Maryland Regulation ("COMAR") and the obvious intent of the regulations, and the Majority does not consider the practical outcome associated with adopting the MDE's interpretation. With evenhandedness, the Majority expressly acknowledges that "Kor-Ko's perception that the MDE failed to consider adequately the health of people within the commercial park is understandable." Maj. Slip Op. at 23. Nonetheless, the Majority defers to the MDE's interpretation of the term "premises." Maj. Slip Op. at 18. I disagree with that conclusion because the MDE's interpretation of the term "premises" is not based on a consistent, long-standing practice, but rather represents a matter of first impression that has wide-ranging practical implications beyond this case.

Because this case involves regulatory interpretation, the principles of regulatory construction are applicable. "The interpretation of an agency rule is governed by the same principles that govern the interpretation of a [s]tatute." Thanner Enters., LLC v. Balt. Cty., 441 Md. 265, 277, 995 A.2d 257, 264 (2010) (citation, brackets, and internal quotation marks omitted). To that end, the "primary objective is to ascertain and effectuate the intent

of the Legislature." Id. at 277, 995 A.2d at 264 (citation and internal quotation marks omitted). As we have recognized, "[t]he most reliable indicator of the Legislature's intent is the statute's plain language as ordinarily understood[,]" and "[i]f statutory language is unambiguous when construed according to its ordinary and everyday meaning, then we give effect to the statute as it is written." Id. at 277, 995 A.2d at 264 (citations and internal quotation marks omitted). However, if "the language is ambiguous because it gives rise to more than one reasonable interpretation, we must look to other indicia to ascertain the intent of the General Assembly, including the relevant statute's legislative history, the context of the statute within the broader legislative scheme, and the relative rationality of competing constructions." Twigg v. State, 447 Md. 1, 24, 133 A.3d 1125, 1139 (2016) (citation and internal quotation marks omitted). "In all cases, when confronted with construing the meaning of a statutory provision, we must provide a reasonable interpretation—one that is consonant with logic and common sense." Id. at 24, 133 A.3d at 1139 (citation omitted).

Code of Maryland Regulation ("COMAR") 26.11.15.06A(1), concerning the ambient impact requirement for new installations, sources, or premises, provides:

> [A] person may not construct, modify, or operate, or cause to be constructed, modified, or operated, any new installation or source without first demonstrating to the satisfaction of the Department using procedures established in this chapter that total allowable emissions from **the premises** of each toxic air pollutant discharged by the new installation or source will not unreasonably endanger human health.

(Emphasis added). And, COMAR 26.11.15.04A(2) states that emissions from new installations must be "quantified in sufficient detail to determine whether **the premises**

complies with the requirements of [the State's Air Quality Regulations]." (Emphasis added). COMAR 26.11.01.01B(36) and COMAR 26.11.15.01B(12) define "premises" as "all the installations or other sources that are located on contiguous or adjacent properties and that are under the control of one person or under common control of a group of persons." No Maryland case has addressed what the term "premises" means when applied in the context of these regulations, and, as the majority opinion recognizes, the MDE's interpretation of the term "premises" is not a longstanding and consistent interpretation of the term. See Maj. Slip Op. at 17 n.14. The matter before the Court is one of first impression.

Applying basic principles of regulatory construction, I would conclude that the MDE's interpretation of the term "premises" conflicts with the plain language of COMAR 26.11.15.06A(1), which clearly refers to "premises" as being the location of the new installation or source from which toxic emissions are discharged. COMAR 26.11.15.06A(1) states, in relevant part, that a person may not construct or operate "any new installation or source without first demonstrating . . . that the total allowable emissions from the premises of each toxic air pollutant discharged by the new installation or source will not unreasonably endanger human health." By tying the new installation or source to the toxic emissions from the premises, as used in COMAR 26.11.15.06A(1), "premises" plainly means the space or unit from where the emissions are coming, *i.e.*, the location of the new installation or source; COMAR 26.11.15.06A(1) does not refer to other spaces from which there are no toxic emissions or pollutants, and which are not affected by the new installation or source. It is the installations and sources of toxic emissions that are key

- 3 -

to determining what the premises are, not other areas entirely unassociated with the installations and sources of toxic emissions. Indeed, in the context of this case, it would be illogical for "premises" to mean a whole commercial park development where the installation or source of toxic emissions will be the crematory located in only one suite of the commercial park and where the other suites do not contain installations or sources of toxic emissions that would need to be regulated. In other words, the entire commercial park is not an installation or source of toxic emissions, and it strains reason to conclude that the entire commercial park must be the "premises" under COMAR 26.11.15.06A(1).

Moreover, adopting the MDE's interpretation of the term "premises" as meaning the entire commercial park, extending to the property line, poses two problems. First, the MDE's interpretation of the term "premises" sets up an unnecessary demarcation between renters and owners that produces an unreasonable result. If Maryland Crematory, LLC ("MC") owned the suite in the commercial park building in which the crematory is to be located—which it does not—then, according to the MDE's interpretation of "premises," the premises would be the suite itself to its property line, and not the entire commercial park to its property line. This is so because the suite, if owned by MC, would be under the "control of one person or under common control of a group of persons[,]" as "premises" is defined by COMAR 26.11.01.01B(36) and COMAR 26.11.15.01B(12). In other words, the premises would be limited to the area within the property line that is under the control of one person or under the common control of a group of persons, *i.e.,* the suite owned by MC. However, because MC rents the suite in the commercial park building, the MDE interprets "premises" as including the entire commercial park, extended to its property line,

which is under the control of a single landlord/business entity, Stone Snyder. Put simply, utilizing the MDE's interpretation of "premises" sets up an unnecessary and unwarranted distinction between renters of properties and owners of properties. This is obviously an arbitrary and, indeed, nonsensical outcome that should be avoided. See Twigg, 447 Md. at 24, 133 A.3d at 1139 ("In all cases, when confronted with construing the meaning of a statutory provision, we must provide a reasonable interpretation—one that is consonant with logic and common sense." (Citation omitted)).

Second, the obvious goal or intent of regulations concerning ambient impact and compliance with toxic emissions standards is to safeguard human health. COMAR 26.11.15.06A(1) expressly states that a person may not construct, modify, or operate any new installation or source without first demonstrating that the toxic emissions from the installation or source "will not unreasonably endanger human health." Holding that the whole commercial park, to its property line, is the premises for purposes of regulatory compliance in this case could render environmental testing less effective and even meaningless in future cases, and undermine the intent of the regulations to protect human health. Indeed, under the MDE's interpretation of "premises," there could be a development comprised of rental units, under the "control of one person or under common control of a group of persons[,]" so large that environmental testing would be rendered meaningless if the installation or source of toxic emissions were a single location or suite within the development. Stated otherwise, if the commercial park in this case were larger and included a larger area within its property line, but the crematory remained just in one suite of the commercial park building, the screening requirements would nonetheless

remain the same, but the toxic emissions would be measured against the larger area. As such, under the MDE's interpretation of "premises," there could be a premises so large that environmental testing would serve no practical purpose in measuring and limiting toxic emissions. Thus, applying the MDE's interpretation of the term "premises" is simply not logical, and may lead to results that are not consistent with the regulation's intent to safeguard human health.

Given that the MDE's interpretation of "premises" is not a longstanding and consistent interpretation that has been tested and applied over time with workable results, there is less of a basis to defer to the MDE's interpretation in this instance. Accordingly, I would conclude that the plain language of the relevant COMAR, practical considerations, and the need for regulatory compliance to protect human health lead to the conclusion that "premises" means the individual suite in which the crematory is to be located, not the area at and inside the boundary, or property line, of the commercial park in which the suite is located.

For the above reasons, respectfully, I dissent.

Judge Greene and Judge McDonald have authorized me to state that they join in this opinion.