*GenOn Mid-Atlantic, LLC, et al. v. MDE, et al.*, Nos. 883, 884 & 885, September Term, 2019. Opinion by Nazarian, J.

**ADMINSTRATIVE LAW — QUASI-JUDICIAL AGENCY DISCRETION**

The agency's permitting decisions were not arbitrary and capricious where the agency followed existing federal regulations to set compliance deadlines for coal-powered steam electric power plant point sources instead of holding regulations in abeyance until further rulemaking is held.

Circuit Court for Charles County, Case No. 08-CV-18-872
Circuit Court for Montgomery County, Case No. 454414V
Circuit Court for Prince George's County, Case No. CAL18-31471

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 883, 884, 885

September Term, 2019
_____

CONSOLIDATED CASES
_____

GENON MID-ATLANTIC, LLC, ET AL.

v.

MARYLAND DEPARTMENT OF THE
ENVIRONMENT, ET AL.
_____

Nazarian,
Reed,
Truffer, Keith R.
    (Specially Assigned),

JJ.
_____

Opinion by Nazarian, J.
_____

Filed: October 28, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

*"The rabbit-hole went straight on like a tunnel for some way, and then dipped suddenly down, so suddenly that Alice had not a moment to think about stopping herself before she found herself falling down a very deep well."*[1]

GenOn Mid-Atlantic, LLC, NRG Chalk Point, LLC, and GenOn Chalk Point, LLC (collectively "GenOn") operate three coal-powered steam electric generating power plants in Maryland. Burning coal produces pollutants, and GenOn needs a permit for each plant from the Maryland Department of the Environment (the "Department") to discharge pollutants into Maryland's waters. GenOn applied for renewed permits to replace permits that were expiring. The Department analyzed the applications under existing federal environmental regulations and issued permits that, everyone agrees, comply with these regulations in force at the time of issuance.

Why, then, are we here? Well, the federal regulations in place at the time the permits were issued were promulgated by the United States Environmental Protection Agency ("EPA") during an earlier presidential administration, and the current EPA had expressed an intention to revisit the applicable federal regulation (and, to acknowledge the elephant in the room, loosen them). At the time the case arose, the EPA had not actually begun the rulemaking process that is required to act on that intention, but GenOn asked the Department to issue permits with terms that reflected the (later, hypothetical) compliance deadlines at which the EPA had hinted but, again, had not yet begun the process of adopting. [2] After the Department issued permits consistent with the regulations existing at

<hr>

[1] Lewis Carroll, *Alice in Wonderland* (Colonial Press).
[2] Since oral argument, the EPA has issued a final rule (the "2019 Rule"), to take effect December 14, 2020, revising the effluent limitation guidelines ("ELGs") governing

the time, GenOn sought judicial review in the circuit courts of the plants' respective counties, and contended that each permit was arbitrary and capricious because the Department did not await or anticipate the not-yet-revised regulations or give GenOn additional opportunities to show they couldn't comply with the deadlines in the existing regulations. The courts affirmed the Department's permitting decisions, GenOn appeals, we consolidated the appeals, and we affirm.

## I.     BACKGROUND

### A. Statutory Framework.

Generally speaking, the federal Clean Water Act ("the Act") prohibits the "discharge of any pollutant by any person" into our "navigable waters." 33 U.S.C. §§ 1311(a), 1362(7), (12) (2018); *see Md. Dept. of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 96 (2016). Some businesses, like GenOn's coal-powered plants, seek authority from the EPA to discharge pollutants into the water. *See Md. Dept. of Env't v. Cnty. Comm'rs of Carroll Cnty.*, 465 Md. 169, 184–85 (2019). Through the National Pollution Discharge Elimination System ("NPDES"), the EPA is authorized to issue (or to delegate to state environmental agencies to issue) discharge permits. But that authority, once granted, isn't unfettered—the permits contain restrictions "on the type and quantity of pollutants that can be released" in order to serve the purpose of the Act. *Anacostia Riverkeeper*, 447 Md. at 96 (*quoting S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541

---

discharges of bottom ash transport water and flue gas desulfurization ("FDG") wastewater. Steam Electric Reconsideration Rule, 85 Fed. Reg. 64,650 (Oct. 13, 2020) (to be codified at 40 C.F.R. pt. 423). The new rule shall be considered "issued" as of October 27, 2020, followed by a 120-day period for judicial review. *Id.*

U.S. 95, 102 (2004)); *see* 33 U.S.C. § 1342 (2018).

The EPA has the power to delegate its permitting authority to a state so long as the state establishes "a parallel permitting program" as required under the Act. *Carroll Cnty.*, 465 Md. at 185; *see* 33 U.S.C. § 1342(b). The EPA has done this in Maryland, and the permitting authority is the Department. *Anacostia Riverkeeper*, 447 Md. at 96; *see* Md. Code (1987, 2014 Repl. Vol.), § 9-253 of the Environment Article ("EN"); *see* COMAR 26.08.04.01. Permits are valid for fixed periods of five years or less, subject to renewal. 33 U.S.C. § 1342(b)(1)(B); EN § 9-328(b). The Act also contains an "anti-backsliding" prohibition that forbids later permits from containing more lenient conditions than their predecessors. 33 U.S.C. § 1342(o); *see Carroll Cnty.*, 465 Md. at 185.

The Act defines "water quality standards" that set limits on the concentration of pollutants in water for public use. *Carroll Cnty.*, 465 Md. at 186; *see* 33 U.S.C. § 1313(c)(2)(A) (2018). To achieve the Act's water quality standards, permits place restrictions on pollutants. "Effluent limitation[s]" are "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged . . . into navigable waters . . . ." 33 U.S.C. § 1362(11). The Department incorporates effluent limitation guidelines ("ELGs") into the permits it issues. *See* 40 C.F.R. § 125.3 (2019). ELGs, in turn, address different classes of pollutants. 33 U.S.C. § 1314(b). Instead of targeting the *quantity* of pollutants pushed into our waters by dischargers, ELGs focus on the *technology* the discharger uses to clean the types of pollutants discharged into the environment. *Id.*

3

GenOn's coal-fired power plants produce two types of pollutants that are at issue here: flue gas desulfurization ("FGD") wastewater and bottom ash transport water. Coal-fired power generating units produce flue gas, which contains "large quantities of particulate matter, sulfur dioxide, and nitrogen oxides," that would be released into the atmosphere unless they were cleaned first. Effluent Limitations Guidelines and Standards for the Steam Electric Power, 80 Fed. Reg. 67,838, 67,846 (Nov. 3, 2015) (codified at 40 C.F.R. pt. 423). The units are equipped with air pollution control systems that clean the air and remove sulfur dioxide. However, FGD systems produce wastewater that contains pollutants, including "chemical precipitation, biological treatment, and evaporation." Effluent Limitations Guidelines, 80 Fed. Reg. at 67,846. Bottom ash transport water contains heavy ash particles that fall to the bottom of coal-fired furnaces. Normally, the bottom ash is cooled in a water-filled hopper that produces two byproducts, the ash itself and the transport water. *Id.* Technology exists for bottom ash to be cleaned and produce zero discharge. *Id.*

The relevant ELGs require GenOn to use the highest standard of technology it can reasonably acquire, the "best available technology" ("BAT"), to limit the environmental impact of pollutants. The EPA (or here, the Department) determines the BAT for a particular industry by assessing a number of factors:

> Factors relating to the assessment of best available technology shall take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the [Department]

deems appropriate.

33 U.S.C. § 1314(b)(2)(B) (2018). The BAT standard is "more stringent" than others, and "reflect[s] the intention of Congress to use the latest scientific research and technology in setting effluent limits, pushing industries toward the goal of zero discharge as quickly as possible." *Kennecott v. EPA*, 780 F.2d 445, 448 (4th Cir. 1985).

## B. The EPA Remarks On Steam-Powered Electric Plants.

On November 3, 2015, the EPA issued a final rule establishing the ELGs for coal-burning steam plants such as GenOn's (the "2015 Final Rule"). Effluent Limitations Guidelines, 80 Fed. Reg. at 67,838. In its preamble, the Rule states that "[s]team electric power plants contribute the greatest amount of all toxic pollutants discharged to surface waters by industrial categories regulated under the Act." *Id.* Citing the health risks to minority and low-income communities housed near these plants, the EPA stated that the 2015 Final Rule was intended to "establish[] the first nationally applicable limits on the amount of toxic metals and other harmful pollutants that steam electric power plants are allowed to discharge in several of their largest sources of wastewater." *Id.* The 2015 Final Rule imposed stricter limitations on FGD wastewater and required the elimination of pollutants from bottom ash transport water. Effluent Limitations Guidelines, 80 Fed. Reg. at 67,894–96 (listing new standards for mercury, selenium, arsenic, and total dissolved solids in the discharge of FGD wastewater and allowing "no discharge of pollutants in bottom ash transport water").

The 2015 Final Rule was challenged, ultimately unsuccessfully, in cases consolidated in the United States Court of Appeals for the Fifth Circuit. *See Clean Water*

5

*Action v. EPA*, 936 F.3d 308 (5th Cir. 2019). On April 25, 2017, the EPA (now under a new administration) announced in a letter that it planned to reconsider the 2015 Final Rule, and it postponed the effective date of the 2015 Final Rule "pending judicial review" before the Fifth Circuit. Postponement of Certain Compliance Dates, 82 Fed. Reg. 19,005 (Apr. 25, 2017) (codified at 40 C.F.R. pt. 423). A few months later, on September 18, 2017, the EPA issued a final rule lifting the stay and postponing the compliance dates for some types of wastewater (the "2017 Postponement Rule"). Postponement of Certain Compliance Dates, 82 Fed. Reg. 43,494–500 (Sept. 18, 2017) (codified at 40 C.F.R. pt. 423). But 40 C.F.R. § 423.13, which contains the relevant deadlines for implementation of the 2015 Final Rule, had not been revised at the time the permits were issued.[3]

### C. The Department's Permits To GenOn.

GenOn, through the separate LLCs named in the caption of this case, operates three steam electric power plants in Maryland: Chalk Point Generating Station in Prince George's County, Morgantown Generating Station in Charles County, and Dickerson Generating Station in Montgomery County. GenOn needs permits from the Department to discharge wastewater in Maryland's waterways. *See* 33 U.S.C. § 1311(a). The permits contain ELGs controlling the technology GenOn must use for FGD and bottom ash transport water. *See* Effluent Limitations Guidelines, 80 Fed. Reg. at 67,838.[4]

---

[3] EPA submitted a proposed rule modifying the standards in the 2015 Final Rule, and its proposed rule has just been finalized. Steam Electric Reconsideration Rule, 85 Fed. Reg. at 64,650. The public comment period for this new rule, the 2019 Rule, ran from November 22, 2019–January 21, 2020. *Id.*

[4] "[F]lue gas desulfurization (FGD) wastewater means any wastewater generated specifically from the wet flue gas desulfurization scrubber system that comes into contact

GenOn applied to renew each plant's permit, and on July 5, 2017, the Department issued a tentative determination. The tentative determinations were drafts and stated as much. The drafts indicated that the 2015 Final Rule "required new standards to be met . . . 'as soon as possible' beginning November 1, 2018, but no later than December 31, 2023." They noted that the EPA had issued a letter on April 12, 2017 "announc[ing] a decision to reconsider the terms of the new regulations and implement[ing] a stay on the deadlines in the [2015 Final Rule]." The drafts stated that the letter created "uncertainty as to whether the standards required . . . [would] be altered and what deadlines [would] ultimately be applicable." The Department's drafts then outlined the changes to the wastewater standards required under the 2015 Final Rule and noted that "*should the actual limitation be adjusted in a final rule*," the Department would reopen the permit. (emphasis added). Compliance would be required by the dates set forth in 40 C.F.R. § 423.13(k) and (g), or no later than November 1, 2020, the updated deadline for FGD wastewater and bottom ash transport water. Also, the discharger had an option to submit a detailed report requesting a permit modification "within twelve months of the date when the [2015 Final Rule] bec[ame] effective again."

The draft permits underwent a public comment period. GenOn submitted a two-page letter stating that it approved of "the approach that [the Department] ha[d] taken in [the draft] permit regarding language concerning" FGD and bottom ash transport water and

---

with the flue gas or the FGD solids . . . ." Effluent Limitations Guidelines, 80 Fed. Reg. at 67,893. "[B]ottom ash means the ash, including boiler slag, which settles in the furnace or is dislodges from furnace walls." *Id.*

7

that waiting for further rulemaking would serve the EPA's "intention to avoid any actions to meet limits that may change as a result of further rulemaking."[5] The Sierra Club, along with other environmental groups,[6] submitted comments arguing that GenOn could and should meet the delayed November 1, 2020 deadline. They provided a detailed expert opinion by Dr. Ranajit Sahu to support their contention that GenOn had the capacity to meet the guidelines.[7] GenOn didn't specify whether it could meet the ELGs or not in its comments (or in its original application materials), and it raised no objections about feasibility.

The Department issued its final determinations renewing GenOn's permits on July 27, 2018. In the final permits, the Department required GenOn's plants to meet ELG requirements for FGD wastewater and bottom ash transport water no later than November 1, 2020.[8]

### D. Circuit Court Review.

GenOn sought review of the Department's July 27, 2018 final determination in the circuit courts for Prince George's County, Charles County, and Montgomery County, the

---

[5] GenOn submitted substantively similar comments for all three permits.

[6] Sierra Club, Environmental Integrity Project, Chesapeake Climate Action Network, Chesapeake Physicians for Social Responsibility, Clean Water Action, and Patuxent Riverkeeper all joined in the comments.

[7] Dr. Sahu stated in his opinion that [GenOn] "could install technically-proven treatment" to the wastewater to meet the 2015 Final Rule's guidelines.

[8] For FGD wastewater only, the Department provided an option for GenOn to comply no later than December 31, 2023, if it "elected to comply with the voluntary effluent limitation guidelines at 40 C.F.R. 423.13(g)(3)(i)." GenOn has not indicated any intention to meet voluntary FGD guidelines.

counties where GenOn operates their plants. Each circuit court determined that the relevant records contained substantial evidence supporting the Department's permitting decisions and that the Department's decisions to issue the final permits were not arbitrary or capricious.

Here is the timeline of critical events:

| Date | Event |
|---|---|
| Nov. 3, 2015 | The EPA issued 2015 Final Rule. |
| Apr. 25, 2017 | The EPA stayed 2015 Final Rule. |
| July 5, 2017 | The Department issued draft permits for GenOn's plants, public comment period opened after drafts were published. |
| Sept. 18, 2017 | The EPA issued 2017 Postponement Rule. |
| Sept. 26-28, 2017 | Public hearings on draft permits held. |
| Oct. 5-6, 2017 | GenOn submitted written comments to the Department; Environmental groups submitted written comments; Public comment window closed. |
| July 27, 2018 | The Department issued final determinations. |
| Sept. 10, 2018 | GenOn filed for judicial review in the Circuit Courts for Prince George's County, Montgomery County, and Charles County. |
| May 23, 2019 | Prince George's County issued order denying GenOn's petition. |
| June 5, 2019 | Montgomery County issued order denying GenOn's petition. |
| June 23, 2019 | Charles County issued order denying GenOn's petition. |

GenOn appeals all three decisions, and we consolidated the appeals. We supply additional facts as necessary below.

## II.     DISCUSSION

GenOn raises two issues that we rephrase. *First*, were the Department's final determinations, both grounded in the 2015 Final Rule and 2017 Postponement Rule, arbitrary and capricious? *Second*, did the Department's final determinations lack substantial evidence in the record?

9

Judicial review of administrative actions begins in the circuit court. *See* Md. Rule 7-201 *et seq*. On appeal, though, an appellate court "looks through the circuit court's . . . decision[] . . . and evaluates the decision of the agency." *Kor-Ko Ltd. v. Md. Dept. of Env't*, 451 Md. 401 (2017) (*quoting People's Counsel for Balt. Cnty. v. Suria*, 400 Md. 663, 682 (2007)). As such, we review the Department's decision to issue the renewed permits directly. *Md. Dept. of Env't v. Cnty. Cmm'rs of Carroll Cnty.*, 465 Md. 169, 201 (2019). "[W]here an 'organic statute' authorizes judicial review without a contested case hearing and does not set forth a standard of review[,]" we apply the substantial evidence and arbitrary and capricious standards of review. *Kor-Ko*, 451 Md. at 411 (*quoting Md. Dept. of Env't v. Anacostia Riverkeeper*, 447 Md. 88, 118 (2016)).

When we review an agency's factual findings, we assess whether substantial evidence in the record supports the agency's finding. *Id.* An appellate court reviewing for substantial evidence asks "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Anacostia Riverkeeper*, 447 Md. at 120 (*quoting Najafi v. Motor Vehicle Admin.*, 418 Md. 164, 173 (2011)). We defer to the agency's fact-finding and any inferences that the record supports. *Id.* We review in the light most favorable to the agency and we grant the agency "great deference regarding factual questions involving scientific matters in its area of technical expertise." *Id.*

We apply the arbitrary and capricious standard to matters falling within the agency's discretion. *Carroll Cnty.*, 465 Md. at 202. This standard too is "extremely deferential":

> To determine whether the agency's actions were "arbitrary and capricious," we consider whether the agency 'relied on factors which Congress has not intended it to consider, entirely failed

to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Anacostia Riverkeeper*, 447 Md. at 121 (*quoting Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 569 (2d Cir. 2015)). We must be satisfied from the record that the agency "examined the relevant data and articulated a satisfactory explanation for its action." *Id.* (cleaned up) (*quoting Nat. Res. Def. Council*, 808 F.3d at 569).

All told, then, our review of the Department's permitting decisions follows three steps:

> Whether by statute or by common law, courts look for three things when reviewing a quasi-judicial decision: (1) were the findings of fact made by the agency supported by substantial evidence in the record made before the agency; (2) did the agency commit any substantial error of procedural or substantive law in the proceeding or in formulating its decision; and (3) did the agency act arbitrarily or capriciously in applying the law to the facts—in essence, whether a reasoning mind could reasonably reach the conclusion reached by the agency from the facts in the record. With respect to the findings of fact, judicial review is highly deferential. With respect to determining legal error, it is much less so.

*Kor-Ko*, 451 Md. at 411–12 (*quoting Md. Bd. of Pub. Works v. K. Hovnanian's Four Seasons, LLC*, 425 Md. 482, 514 n.15 (2012)). Permitting decisions involve conclusions of law, requiring reviewing courts to consider the agency's expertise in the field:

> An agency decision based on regulatory and statutory interpretation is a conclusion of law. Even when reviewing an agency's legal conclusions, an appellate court must respect the agency's expertise in its field. When an agency interprets its own regulations or the statute the agency was created to administer, we are especially mindful of that agency's

11

expertise in its field.

*Kor-Ko*, 451 Md. at 412 (*quoting Carven v. State Ret. & Pension Sys.*, 416 Md. 389, 406 (2010)). Judicial review of the Department's final determinations ordinarily "shall be on the administrative record before the [Department] and limited to objections raised during the public comment period." *Potomac Riverkeeper, Inc. v. Md. Dept. of Env't*, 238 Md. App. 174, 203 (2018).

## A. The Department's Final Determinations Were Not Arbitrary And Capricious.

GenOn argues that the Department failed to consider an "important aspect of the problem" in its permitting decisions, *see Anacostia Riverkeeper*, 447 Md. at 120, when it didn't follow the "EPA's guidance that the regulated industry should not be bound to effluent limitations that were soon to change." The Department responds that the compliance date included in the final permits was the default compliance date required under the operative EPA regulations and that GenOn's arguments rely improperly on a legally ineffectual regulatory preamble. We hold that the permitting decisions were not arbitrary and capricious.

These permits implicate a mixture of federal and state statutes and regulations. "[T]he interpretation of an agency rule is governed by the same principles that govern the interpretation of a statute." *Kor-Ko*, 451 Md. at 416 (*quoting Carven*, 416 Md. at 407). The Court of Appeals recently summarized the rules governing statutory interpretation in cases involving an agency's permitting decisions:

> When interpreting statutes, we seek to ascertain and implement the will of the Legislature. Our first step toward that goal is to

examine the text. **If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily** and we apply the statute as written, without resort to other rules of construction. **If ambiguities are found, other indicia of legislative intent are consulted**, including the relevant statute's legislative history, the context of the statute within the broader legislative scheme, and the relative rationality of competing constructions.

*Id.* at 417 (emphasis added) (*quoting Harrison-Solomon v. State*, 442 Md. 254, 265–66 (2015)). We give the words in the statute their ordinary meaning. *Id.* (*quoting Scheve v. Shudder, Inc.*, 328 Md. 363, 372 (1992)). "[W]e begin 'with the plain language of the statute, and ordinary, popular understanding of the English language dictates interpretation of its terminology.'" *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (*quoting Schreyer v. Chaplain*, 416 Md. 94, 101 (2010)). We don't "read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Johnson v. State*, 467 Md. 362, 372 (2020).

We apply these same principles when interpreting agency regulations:

We [] do not read [regulatory] language in a vacuum, nor do we confine strictly our interpretation of a [regulation's] plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the [regulatory] scheme to which it belongs, considering the purpose, aim, or policy of the [agency] in enacting the [regulation]. We presume that the [agency] intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a [regulation], to the extent possible consistent with the [regulations] object and scope.

*Lockshin v. Semsker*, 412 Md. 257, 275–76 (2010). "[W]e are especially mindful of [an] agency's expertise in its field" when considering an agency's own regulations. *Kor-Ko*,

451 Md. at 412 (*quoting Carven*, 416 Md. at 406). "When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Id.* (*quoting Md. Transp. Auth. v. King*, 369 Md. 274 (2002)). We accord agencies deference in interpreting their own regulations because of their expertise in their regulatory space:

> [A]gency rules are designed to serve the basic needs of the agency, are promulgated by the agency, and are utilized on a day-to-day basis by the agency. A question concerning the interpretation of an agency's rule is as central to its operation as an interpretation of the agency's governing statute. Because an agency is best able to discern its intent in promulgating a regulation, the agency's expertise is more pertinent to the interpretation of an agency's rule than to the interpretation of its governing statute.

*Kor-Ko*, 451 Md. at 412–13 (*quoting King*, 369 Md. at 289).

Moreover, our examination of legislative intent "contemplates 'the consequences resulting from one construction rather than another.'" *Johnson*, 467 Md. at 364 (*quoting Blaine v. Blaine*, 336 Md. 49, 69 (1994)). We avoid any interpretation that would lead to illogical or absurd results. *Goshen Run Homeowners Assoc., Inc. v. Cisneros*, 467 Md. 74, 109 (2020).

### 1. The ELGs in the 2015 Final Rule and the Department's permits remain valid, and the 2017 Postponement Rule is not an indefinite stay.

GenOn argues that, "[s]ince 2017, the EPA has consistently maintained that the regulated industry not be subject to the new 2015 ELG limits until the EPA completes another round of rulemaking." It argues further that the Department ignored the EPA's "guidance" when it set the November 1, 2020 deadline in its final permits. The Department

14

responds that the plain language of the 2015 Final Rule and the 2017 Postponement Rule supports its final permits to GenOn and contends that GenOn conflates preamble language with the body of the regulations to support its arguments. As we explain, we agree with the Department.

The difference in the two positions reflects the difference between how things actually were at the relevant time and how GenOn wanted them to be. It wasn't pure wishcasting on GenOn's part—the EPA had expressed an intention to modify the regulations, foreshadowed the direction it intended to take, and just now has issued a new rule. All the same, the rules GenOn wanted didn't exist. The EPA's 2015 Final Rule was enacted on November 3, 2015 and its provisions, including the provisions relevant to this case, were in effect when the permit was issued. 80 Fed. Reg. at 67,838. The rule provided updated ELGs, forming stricter rules over coal plants' handling of FGD wastewater and bottom ash transport water. The 2015 Final Rule stated that these new, stricter ELGs would become effective "as soon as possible" within a set date range unless the Department established a different date after receiving the necessary information from the discharger:

> The phrase **"as soon as possible" means November 1, 2018, unless the permitting authority establishes a later date**, after receiving information from the discharger, which reflects a consideration of the following factors:
>
> (1) Time to expeditiously plan (including to raise capital), design, procure, and install equipment to comply with the requirements of this part.
>
> (2) Changes being made or planned at the plant in response to:
>
> > (i) New source performance standards for greenhouse gases from new fossil fuel-fired electric generating units . . . ;

(ii) Emission guidelines for greenhouse gases from existing fossil fuel-fired electric generating units . . . ; or

(iii) Regulations that address the disposal of coal combustion residuals as solid waste . . . .

(3) For FGD wastewater requirements only, an initial commissioning period for the treatment system to optimize the installed equipment.

(4) Other factors as appropriate.

Effluent Limitations Guidelines, 80 Fed. Reg. at 67,894 (codified at 40 C.F.R. § 423.11(t) (2016)) (emphasis added).

GenOn argues, though, that the EPA expressed an intention to revisit the 2015 Final Rule, and the Department should have considered the EPA's intent in setting the deadline for compliance under the "other factors" catch-all in 40 C.F.R. § 423.11(t)(4). In support, it cites preamble language from the administrative stay and the 2017 Postponement Rule. But the plain language doesn't indicate any intent to defer compliance indefinitely and does not have any legal effect in any event.

In April 2017, the EPA issued a notice staying the 2015 Final Rule. Postponement of Certain Compliance, 82 Fed. Reg. 19,005. The notice indicated in its supplementary background information that "the Administrator announced his decision to reconsider the Rule" and that "the Agency [found] that justice require[d] it to postpone the compliance dates of the Rule that ha[d] not yet passed, pending judicial review." *Id.* In making the decision to stay the 2015 Final Rule, the EPA indicated that it was considering "the capital expenditures that facilities incurring costs under the Rule will need to undertake in order to meet" the updated ELGs. *Id.* The stated effect of the stay, again in the supplemental

16

information, was to "preserve the regulatory status quo with respect to wastestreams subject to the Rule's new, and more stringent, limitations and standards, while the litigation is pending and reconsideration is underway." *Id.*

But the EPA lifted the administrative stay five months later when it issued the 2017 Postponement Rule on September 18, 2017. Postponement of Certain Compliance Dates, 82 Fed. Reg. 43,494. And critically, the 2017 Postponement Rule lifting the stay *preserved* the 2015 Final Rule instead of nullifying it or modifying it substantively, as GenOn suggests. And rather than extending compliance deadlines out to 2023, as GenOn would like, the 2017 Postponement Rule pushed compliance deadlines for FGD wastewater and bottom ash transport water to November 1, 2020:

> The phrase 'as soon as possible' means November 1, 2018 (except for purposes of § 423.13(g)(1)(i) [FGD wastewater] and (k)(1)(i) [bottom ash transport water] . . . , in which case it means November 1, 2020), unless the permitting authority establishes a later date, after receiving information from the discharger . . . .

Postponement of Certain Compliance Dates, 82 Fed. Reg. at 43,500. Nothing in the revised regulatory language indicated that the 2015 Final Rule is invalid. To the contrary, it made no other substantive changes to the 2015 Final Rule. Instead, it provided a delay in the date range for compliance but not an indefinite deferral or a reinstatement of the administrative stay.

Still, GenOn cites language from the *preamble* to the 2017 Postponement Rule and argues that this preamble conveys the EPA's intent to conduct another rulemaking and postpone all compliance until then. 82 Fed. Reg. 43,494. But EPA's then-unrequited intent

17

doesn't affect our analysis of these permits. Our review of a regulation ends ordinarily where the plain language of a statute or regulation is unambiguous. *Kor-Ko*, 451 Md. at 416. Where the plain meaning of a statute is unambiguous, we do not need to venture to other sources or indicia to glean intent. *See id.* (articulating that our inquiry ends where the plain language is unambiguous and that ambiguity requires review of other indicia); *see also Chesapeake Ranch Club, Inc. v. Garczynski*, 71 Md. App. 224, 228 (1987) (stating that where the statutory language was unambiguous, "it was unnecessary that the trial court refer to the preamble"). And "although a preamble may be resorted to in aid of the construction of a statute if its meaning is doubtful, it forms no part of the statute," *Clarke v. Cnty. Comm'rs for Carroll Cnty.*, 270 Md. 343, 349 (1973), and it certainly shouldn't be read to undercut the substance of the regulation it introduces.

Here, the plain meaning of the operative regulation is unambiguous—"as soon as possible" means November 1, 2020 for FGD wastewater and bottom ash transport water, unless the permitting authority chooses a later date based on the materials filed by the discharger. Postponement of Certain Compliance Dates, 82 Fed. Reg. at 43,500. Accordingly, the only change to the 2015 Final Rule in the 2017 Postponement Rule is the November 1, 2020 compliance date for the wastestreams relevant here. This delay, along with the administrative lifting of the stay, preserved the 2015 Final Rule.[9] 82 Fed. Reg. at 43,500. In light of the rule's unambiguous language, we don't need to look beyond it to

---

[9] The Fifth Circuit agreed: in issuing the 2017 Postponement Rule, "EPA went out of its way to issue a narrow reconsideration decision, *leaving intact the bulk of the 2015 Rule . . . .*" *Clean Water Action*, 936 F.3d at 312 (emphasis added).

ascertain the agency's intent. *See Kor-Ko*, 451 Md. at 416. And again, we accord substantial deference to an agency's interpretation of its own rules. *Id.* at 412–13. Because the Department's final determinations on these permits hew closely to the language of the unambiguous regulation, the November 1, 2020 deadline for GenOn's compliance with the 2015 ELGs is not arbitrary and capricious.

2. *Other indicia of the EPA's intent do not change our plain meaning interpretation of the 2017 Postponement Rule on the 2015 Final Rule.*

Although we have determined that the plain meaning interpretation of the regulation controls, for the sake of completeness we address GenOn's arguments regarding the preamble language of the 2017 Postponement Rule.

GenOn points to the portion of the preamble stating that the "action to postpone certain compliance dates in the 2015 [Final] Rule is intended to preserve the status quo for FGD wastewater and bottom ash transport water until the EPA completes its next rulemaking . . . ." Postponement of Certain Compliance Dates, 82 Fed. Reg. 43,494–95. It also cites a footnote stating that "[i]f EPA does not complete a new rulemaking by November, 2020, it plans to further postpone the compliance dates such that the earliest compliance date is not prior to the completion of a new rulemaking." 82 Fed. Reg. at 43,498 n.6.

At the same time, the EPA reiterated that the 2015 Final Rule was being preserved. And because it's preserved, the 2015 Final Rule remained controlling over the Department's permitting decisions under the EPA's regulations.

The 2017 Postponement Rule notes that the compliance deadline was being postponed for a set period of two years:

> Under the Clean Water Act ("CWA"), The Environmental Protection Agency (EPA) intends to conduct a rulemaking to potentially revise certain best available technology economically achievable ("BAT") effluent limitations and pretreatment standards for existing sources ("PSES") for the steam electric power generating point source category . . . . EPA is, accordingly, postponing compliance dates in the 2015 Rule. In particular, **EPA is postponing the earliest compliance dates for the new, more stringent, BAT effluent limitations and PSES for flue gas desulfurization ("FGD") wastewater and bottom ash transport water in the 2015 Rule for a period of two years**. . . . EPA's action to postpone certain compliance dates in the 2015 Rule is intended to preserve the status quo for FGD wastewater and bottom ash transport water until EPA completes its next rulemaking concerning those wastestreams, and it thus does not otherwise amend the effluent limitations guidelines and standards for the steam electric power generating point source category.

82 Fed. Reg. 43,494–95 (emphasis added). Yet the preamble states as well that despite the postponement, the 2015 Final Rule was being "maintain[ed]":

> EPA intends to conduct a new rulemaking regarding the appropriate technology bases and associated limits for the . . . requirements applicable to FGD wastewater and bottom ash transport water discharged from steam electric power plants. . . . EPA finds it appropriate to postpone the earliest compliance dates for the new, more stringent, BAT effluent limitations and PSES applicable to FGD wastewater and bottom ash transport water in the 2015 [Final] Rule until it completes the new rulemaking. **This maintains the 2015 Rule as a whole at this time, with the only change being to postpone specific compliance deadlines for two wastestreams.** Thus, the earliest compliance dates for plants to meet the new, more stringent FGD wastewater and bottom ash wastewater limitations and standards in the 2015 Rule, which were to be determined by the permitting authority as a date "as soon as possible beginning November 1, 2018[,]" **are**

20

> **now to be determined by the permitting authority as a date
> "as soon as possible beginning November 1, 2020[.]"**[10]

82 Fed. Reg. at 43,496 (emphasis added). The EPA repeats the preservation of the 2015

Final Rule a second time, writing later that "[t]his action maintains the 2015 [Final] Rule

as a whole at this time, *with the only change being* to postpone specific compliance

deadlines for two wastestreams." 82 Fed. Reg. at 43,499 (emphasis added).

Thus, even if we were to consider other manifestations of the EPA's intent, which

we are not required to do, we view the preamble of the 2017 Postponement Rule as a whole

to indicate an intent to maintain the 2015 Final Rule until a new rulemaking took place and

a new rule takes effect. The preamble acknowledges the potential for a new rulemaking,

but reaffirms the efficacy of the 2015 Final Rule, at least in the interim. The preamble

merely re-states the EPA's intent to conduct a new rulemaking and that the earliest

compliance dates would be delayed for *two years*:

> This is a final rule **to delay action**, and it does not change the
> requirements of the effluent limitations guidelines and
> standards published in 2015.

82 Fed. Reg. at 43,499 (emphasis added).

---

[10] In 2017, 40 C.F.R. § 423.11(t) was amended to conform to the 2017 Postponement Rule
and reflect the modified compliance dates for certain types of waste, including FGD and
bottom ash transport water:

> The phrase "as soon as possible" means November 1, 2018
> (except for purposes of [FGD and bottom ash transport
> water] . . . , in which case it means November 1, 2020), unless
> the permitting authority establishes a later date . . . .

40 C.F.R. § 423.11(t) (2017); *see* 40 C.F.R. § 423.13(g)(1)(i) (FGD wastewater), (k)(1)(i)
(bottom ash transport water).

Intent notwithstanding, at the time the permits were issued the EPA had yet to initiate any new rulemaking, so to ignore the 2015 Final Rule in favor of a rulemaking that had not yet started undermines the plain meaning of the 2017 Postponement Rule.

Moreover, preambles deserve less substantive weight than the regulations they introduce, and "[t]o the extent that the preamble collides with the plain and unambiguous language of the ordinance, the latter must prevail." *Clarke*, 270 Md. at 349. *Compare Pomeranc-Burke, LLC v. Wicomico Env't Trust, Ltd.*, 197 Md. App. 714, 748 (2011) (finding that where a statement of purpose is included in the body of the ordinance, and not a separate preamble, and where that purpose is not inconsistent with the ordinance, the purpose may be considered). Even if GenOn's interpretation were correct, the language of the preamble cannot be applied indefinitely to postpone the 2015 Final Rule because it would conflict with the plain meaning of the regulations. The EPA could have modified the 2015 Final Rule outright and did not, conspicuously. Instead, it chose to keep the existing regulations in place, except to extend the compliance deadline by two years. The unambiguous substantive regulation prevails over a preamble that anticipates its future amendment.

GenOn's reading of the regulations would take a clear, unambiguous regulation and construe it in a way that reaches an absurd, illogical result. *See Goshen Run*, 467 Md. at 109. Its approach leaves the Department unable to enforce a current rule, in anticipation of a future rule that does not exist (and for which the rulemaking process has not even started), and puts aside GenOn's request that we ignore the EPA's stated intent to *maintain* the 2015 Final Rule for now. It's not hard to think of ways in which this would lead to regulatory

chaos. And we wonder too if this anticipatory regulation principle is meant to apply consistently. Imagine, for example, that a future administration comes to Washington promising to reduce pollution and accelerate compliance deadlines—would GenOn be asking the Department and the courts to incorporate the EPA's promised-but-unmade rules into their next permit? Whatever the answer, we decline to attempt the advanced analytical gymnastics necessary to reach the result GenOn seeks. The Department was correct to apply the regulations in place at the time of the permit, and its decisions to issue permits that track the 2015 Final Rule and 2017 Postponement Rule were not arbitrary and capricious.

> 3. *The Department was not required to maintain language from its draft permits in its final determinations.*

In a related point, GenOn argues by extension that the Department's decisions to issue the final permits are arbitrary and capricious because the Department made a "drastic and unforeseeable change" in the permit language between its *draft* permits and the final permits. It contends that the differences between the draft permits and the final determinations "resulted in significant harm to GenOn." GenOn seems, in essence, to be arguing that it developed a reliance interest in the terms of the draft permits and that it was harmed when the Department issued final permits with a set deadline instead of a "flexible" deadline.

The draft permits were issued on July 5, 2017, during the stay of the 2015 Final Rule. The Department explained the state of the permitting deadlines during that uncertain period:

23

On September 30, 2015, EPA finalized revisions to the regulations for the Steam Electric Power Generating category at 40 CFR 423. . . . The updated rule required new standards to be met for [FGD wastewater and bottom ash transport water] "as soon as possible" beginning November 1, 2018, but no later than December 31, 2023.

In a letter dated April 12, 2017, the EPA administrator announced a decision to reconsider the terms of the new regulations and implemented a stay on the deadlines in the final rule. **There is now uncertainty as to whether the standards required under the September 30, 2015 promulgation will be altered and what deadlines will ultimately be applicable.**

The following requirements . . . automatically adjust the applicable implementation deadline dates if the dates remain the same (as in the 2015 rule promulgation) or if these dates are changed. However, should the actual limitations be adjusted in a final rule, the Department shall reopen the permit . . . .

After providing this context about the uncertainty surrounding the compliance dates at that time, the Department provided the following requirements for implementation of the new ELGs:

1. *Bottom Ash Transport Water*. The permittee must cease the discharge of bottom ash transport water no later than the date specified at 40 CFR 423.13(k) once the stay is lifted or the rule terms are altered (originally specified as November 1, 2018 in the 2015 promulgation) **unless a request for major permit modification** (i.e. including public participation) **is submitted by the permittee within twelve months of the date when the rule becomes effective again.** Any such request must include a report which analyzes potential methods for stopping discharges of bottom ash transport water, selects the method most appropriate for this facility, explains reasoning for the selected method, and proposes a timeline for ceasing discharges as soon as possible.

The draft permits indicated that if a proper request was received within the twelve-month timeframe, the compliance dates would default to the *latest* allowable date under 40 C.F.R. 423.13(k) or December 31, 2023. The language relating to the FGD compliance date was similar:

> 2. *FGD Wastewater*. Within 12 months of the date when the rule becomes effective again, the permittee may submit a request for major permit modification (i.e. including public participation) to change the effective date of the new limits for arsenic, mercury, selenium, and nitrate-nitrate at [the monitoring point]. Such a request must include a report analyzing potential treatment options, selection of the option(s) deemed most appropriate for the facility, and a proposed timeline for meeting the new limits. If the Department receives such a request within the allotted 12-month timeframe, the date for transitioning from the limits . . . shall default to the latest allowable completion date according to 40 CFR 423.13(g)(1)(i) (originally specified as December 31, 2023 in the 2015 promulgation) until the modification is issued or denied.

The final determinations, though, were issued after the stay was lifted and set the compliance deadline as November 1, 2020.[11]

---

[11] The permits state as follows:

> X. COMPLIANCE WITH NEW EFFLUENT LIMITATION GUIDELINES
>
> 1. *Bottom Ash Transport Water*. The permittee must cease the discharge of bottom ash transport water no later than November 1, 2020 pursuant to the effluent limitation guidelines at 40 CFR 423.13(k)(1)(i).
>
> 2. *FGD Wastewater*. The permittee must comply with the limits for arsenic, mercury, selenium, and nitrate-nitrite promulgated in the new effluent limitation guidelines at 40 CFR 423.13(g)(1)(i) no later than November 1, 2020.

25

GenOn argues that the change in the permit language between the draft permits and the final determinations was "drastic and unforeseeable." We disagree.

*First*, GenOn cites no precedent, and we have not found any, to suggest that the Department *cannot* make changes between its drafts and final determinations. Indeed, one purpose of issuing drafts and requesting public comment is to determine whether to make any changes before issuing a final determination. Final permits do not need to be "identical" to the draft permit. *Potomac Riverkeeper*, 238 Md. App. at 204. "That would be antithetical to the whole concept of notice and comment. Indeed, it is the expectation that the final rules will be somewhat different—and improved—from the rules originally proposed by the agency." *Id.* (*quoting Nat. Res. Def. Council v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002) (cleaned up). *Second*, GenOn had been on notice that it would face stricter compliance standards since November 3, 2015, when the 2015 Final Rule was issued. It has known, at least since then, that (1) the EPA intended to increase the ELG standards relevant to GenOn's businesses and (2) that the compliance window could begin as early as November 1, 2018 (later amended to November 1, 2020). GenOn cannot argue credibly that it was blindsided by any of this.

**B. The Department's Final Determinations Were Supported By Substantial Evidence.**

GenOn argues that the Department's permitting decisions are not supported by substantial evidence in the record because GenOn couldn't conduct and submit its own feasibility study on whether it could comply with the 2015 Final Rule ELGs by November 1, 2020. It argues that without its own feasibility study, the record before the Department

was incomplete, and the permitting decisions should be "remanded to [the Department] to consider feasibility evidence." The Department responds that it had enough information on GenOn's capacity to meet the ELG requirements to issue the permits and that it was GenOn's responsibility to inform the Department during the comment period if it was unable to meet the guidelines. The Department responds further that GenOn cannot raise feasibility concerns now because it failed to do so during the comment window. We agree with the Department.

Ordinarily, our review of the Department's final determinations "shall be on the administrative record" before the Department and is "*limited to objections raised* during the public comment period." *Potomac Riverkeeper*, 238 Md. App. at 203 (emphasis added). Maryland Code (1987, 2013 Repl. Vol.), EN § 1-601(d) provides that:

> (1) Judicial review shall be on the administrative record before the Department and limited to objections raised during the comment period, unless the petitioner demonstrates either that:
>
> > (i) The objections were not reasonably ascertainable during the comment period; or
> >
> > (ii) Grounds for the objections arose after the comment period.

If a party meets the exceptions, "[t]he court shall remand the matter to the Department for consideration[.]" EN § 1-601(d)(2). In 2018, this Court explained the Department's permitting process, as outlined in the Environment Article:

> The statutory scheme for public comment on the [Department]-issued permits listed in EN § 1-601(a) contemplates published notice of permit applications (EN § 1-602), informational meetings (EN § 1-603), and publication of [Department's] tentative determination (EN § 1-604(a)). If the tentative determination is to grant the application, EN § 1-604(a)(3)

requires [the Department] to prepare a draft permit and "publish a notice of the tentative determination" that provides 30 days for public comment, and, if requested, hold a public hearing pursuant to EN § 1-604(a)(4).

*Potomac Riverkeeper*, 238 Md. App. at 204. After the public comment window, though, the statute doesn't provide for another comment window without special exception:

> There is no statutory provision for additional public comment on [the Department's] final determination and revised final permit; [the Department] is simply required to publish a "notice of final determination" pursuant to EN § 1-604(2), after which an eligible party may petition for judicial review . . . . **At that point, the judicial review is limited to the administrative record and "limited to objections raised during the public comment period"** *unless* **the petitioning party can demonstrate that there are new objections that "were not reasonably ascertainable during the comment period," or "arose after the comment period" ended.** EN § 1-601(d)(1).

*Id.* (emphasis added). The petitioning party, then, must demonstrate "that there are *genuinely new objections* that are materially different" from what the Department had considered already. *Id.* Indeed, if there were no materially different objections, then "remand would serve no purpose, and would only introduce unnecessary delay . . . ." *Id.* at 205.

Here, GenOn argues that remand is necessary because it was unable to submit its own feasibility information. That's nonsense. All of the information regarding GenOn's ability to meet the new ELGs is in GenOn's possession and *was* reasonably ascertainable during the comment period (and long before). GenOn simply failed to submit it. We need not speculate as to why GenOn decided not to conduct a feasibility study and supply that information—whatever its reasons, GenOn could have developed and provided a study

28

during the comment period and did not, and it is not entitled to a do-over.

GenOn contends in its brief that the "flexible" draft permit language, combined with its interpretation of the status of the EPA's rules, provided the basis for its decision to "focus[]" its comments "on the legal status of the 2015 ELG Rule" and to request that the Department state that compliance would only be due "'after the ELG is revised.'" Perhaps, but that explains GenOn's tactical decisions—it does not establish a basis to vacate the permits and allow GenOn to try another tactical approach. GenOn, a sophisticated company with sophisticated advisors, *chose* not to provide feasibility information in favor of an all-or-nothing interpretive argument aimed at extending the compliance deadlines indefinitely. GenOn may have swung for the fences and missed, but that doesn't change the fact that the information GenOn needed to demonstrate feasibility was reasonably ascertainable during the comment period. We know this too because the Environmental Groups *did* supply feasibility information in the form of an expert report.

GenOn argues that it didn't focus on feasibility at that time because it "was operating under the impression that it would have an opportunity to submit feasibility data" *after* the final permits were issued and asserts that it wasn't on notice that the Department would impose different terms than were included in the draft permits. But GenOn *was* on notice. The terms of the final permits were lifted directly from the 2015 Final Rule and the 2017 Postponement Rule. GenOn had years to absorb the information included in these regulations and assess whether it would, in fact, be subject to them. GenOn claims that it "had no opportunity to respond to the technical aspects" raised during the comment period as to feasibility, but that's just wrong. GenOn had the very same comment window as other

organizations to submit feasibility information, but it passed on that opportunity in favor of its interpretive argument. Any wounds GenOn suffered as a result were self-inflicted and do not supply a basis to blow up these fully compliant permits.

**JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY, CASE NO. 08-CV-18-872, AFFIRMED.**

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, CASE NO. 454414V, AFFIRMED.**

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, CASE NO. CAL18-31471, AFFIRMED.**

**APPELLANT TO PAY COSTS.**